# In the United States Court of Appeals
# For the Eighth Circuit

MARIO MANCINI,

APPELLANT,

V.

UNITED STATES OF AMERICA,

APPELLEE.

*Appeal from the*
*United States District Court for the*
*District of Minnesota*

## BRIEF OF APPELLEE

ANDREW M. LUGER
   *United States Attorney*

David W. Fuller
Lucas B. Draisey
   *Assistant U.S. Attorneys*

*U.S. Attorney's Office*
*District of Minnesota*
*600 U.S. Courthouse*
*300 South Fourth Street*
*Minneapolis, MN 55415*
*(612) 664-5600*

Attorneys for Appellee

## SUMMARY OF THE CASE

Plaintiff Mario Ferbo Mancini failed to support his medical malpractice claim with valid expert testimony. The district court granted summary judgment for the United States, holding that Dr. Gary Wyard's broad and conclusory expert-disclosure affidavit "does not meet the level of specificity required by Minnesota law," and dismissed the action under Minnesota's certificate-of-merit statute.

The court also held that Dr. Wyard's affidavit was inadmissible under Rule 702 and the *Daubert* line of cases. The expert's opinions, the court correctly held, were based on alleged facts that were unsupported or contradicted by the record evidence, and he failed to explain the principles or methodology underlying his analysis. The court properly excluded the testimony of Mancini's only expert witness, requiring summary judgment.

This Court can affirm the district court's summary-judgment order without oral argument. But if oral argument would assist the Court in deciding the issues, the United States requests 15 minutes to present its arguments.

i

# TABLE OF CONTENTS

SUMMARY OF THE CASE...................................................................i

TABLE OF CONTENTS................................................................ii

TABLE OF AUTHORITIES ...............................................iv

STATEMENT OF THE ISSUES ...........................................1

STATEMENT OF THE CASE ..............................................2

I.   Factual Background ................................................. 2

II.  Procedural History.................................................9

SUMMARY OF THE ARGUMENT....................................15

ARGUMENT ...................................................................17

I.   The district court did not abuse its discretion by excluding
     Dr. Wyard's opinions under Rule 702. .................................17

     A.   Standard of Review.........................................17
     B.   The district court properly exercised its discretion by
          excluding Dr. Wyard's opinions under Rule 702 and
          *Daubert.* ................................................17

II.  Mancini's expert affidavit failed to comply with Minnesota
     substantive law. ....................................................25

     A.   Standard of Review.........................................25
     B.   Dr. Wyard's broad and conclusory affidavit fails to
          meet the requirements of section 145.682. ...................26
     C.   The district court did not abuse its discretion by
          imposing the statute's "mandatory dismissal with
          prejudice" remedy. ..........................................38

III. The district court correctly limited its analysis to the
     material facts. ......................................................39

ii

A.    Standard of Review..........................................................39

B.    Mancini's nonexpert speculation does not create a material factual dispute. ...................................................40

CONCLUSION.....................................................................................41

CERTIFICATE OF COMPLIANCE ....................................................43

Appellate Case: 24-1464    Page: 4    Date Filed: 07/17/2024   Entry ID: 5414272

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ...................................................... 1, 40

*Anderson v. Rengachary,*
    608 N.W.2d 843 (Minn. 2000) ............................... 28, 29, 35

*Bivens v. Six Unknown Fed. Narcotics Agents,*
    403 U.S. 388 (1971) ...................................................... 9

*Bland v. Verizon Wireless, (VAW) L.L.C.,*
    538 F.3d 893 (8th Cir. 2008) ........................................ 24

*Broehm v. Mayo Clinic Rochester,*
    690 N.W.2d 721 (Minn. 2005) ...................................... 27

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
    509 U.S. 579 (1993) ...................................................... 1

*Flores v. United States,*
    689 F.3d 894 (8th Cir. 2012) ................................... 26, 38

*Gen. Elec. Co. v. Joiner,*
    522 U.S. 136 (1997) ................................................ 17, 24

*Glastetter v. Novartis Pharms. Corp.,*
    252 F.3d 986 (8th Cir. 2001) ........................................ 24

*Klisch v. Meritcare Med. Grp., Inc.,*
    134 F.3d 1356 (8th Cir. 1998) ...................................... 30

*Knudsen v. United States,*
    254 F.3d 747 (8th Cir. 2001) ........................................ 32

Appellate Case: 24-1464    Page: 5    Date Filed: 07/17/2024 Entry ID: 5414272

*Kumho Tire Co., Ltd. v. Carmichael,*
  526 U.S. 137 (1999) ........................................................ 18

*Lauzon v. Senco,*
  270 F.3d 681 (8th Cir. 2001) ..................................... 1, 18

*Leubner v. Sterner,*
  493 N.W.2d 119 (Minn. 1992) .................................... 33

*Lindberg v. Health Partners, Inc.,*
  599 N.W.2d 572 (Minn. 1999) ............................... 28, 34

*Marmo v. Tyson Fresh Meats, Inc.,*
  457 F.3d 748 (8th Cir. 2006) ................................ 21, 24

*Mattke v. Deschamps,*
  374 F.3d 667 (8th Cir. 2004) ................................ 28, 31

*Oulelette v. Subak,*
  391 N.W.2d 810 (Minn. 1986) .................................... 30

*Rygwall, as Trustee for Rygwall v. ACR Homes, Inc.,*
  6 N.W.3d 416 (Minn. 2024) .................................. 36, 37

*Shipp v. Murphy,*
  9 F.4th 694 (8th Cir. 2021) ....................................... 19

*Silver v. Redleaf,*
  194 N.W.2d 271 (Minn. 1972) .................................. 1, 41

*Sorenson v. St. Paul Ramsey Med. Ctr.,*
  457 N.W.2d 188 (Minn. 1990) .............................. passim

*Spring Co. v. Edgar,*
  99 U.S. 645 (1879) .................................................... 17

*Stowell v. Huddleston,*
  643 F.3d 631 (8th Cir. 2011) ....................... 26, 28, 31, 40

Appellate Case: 24-1464     Page: 6     Date Filed: 07/17/2024 Entry ID: 5414272

*Stroud v. Hennepin County Med. Ctr.*,
    556 N.W.2d 552 (Minn. 1996) .................................................. passim

*Swanson v. Chatterton*,
    160 N.W.2d 662 (Minn. 1968) ........................................................31

*Teffeteller v. Univ. of Minn.*,
    645 N.W.2d 420 (Minn. 2002) ................................................. passim

*Turner v. Iowa Fire Equip. Co.*,
    229 F.3d 1202 (8th Cir. 2000) ......................................................24

*Unrein v. Timesavers, Inc.*,
    394 F.3d 1008 (8th Cir. 2005) ......................................................23

*Wall v. Fairview Hosp. and Healthcare Servs.*,
    584 N.W.2d 395 (Minn. 1998) ......................................................19

*Walton v. Jones*,
    286 N.W.2d 710 (Minn. 1979) ......................................................15

**Statutes**
28 U.S.C. § 1346(b)(1) ...................................................................32

Minnesota Statutes § 145.682 .................................................. passim

**Rules**
Fed. R. Evid. 104(a) ......................................................................18

Fed. R. Evid. 702.................................................................... passim

vi

## STATEMENT OF THE ISSUES

I.  Did the district court abuse its discretion by concluding Dr. Wyard's affidavit failed to meet Federal Rule of Evidence 702's admissibility requirements?

Fed. R. Evid. 702
*Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993)
*Lauzon v. Senco*, 270 F.3d 681 (8th Cir. 2001)

II.  Does Mancini's broad and conclusory expert-disclosure affidavit comply with Minnesota Statutes Section 145.682?

Minn. Stat. § 145.682
*Sorenson v. St. Paul Ramsey Med. Ctr.*, 457 N.W.2d 188 (Minn. 1990)
*Teffeteller v. Univ. of Minn.*, 645 N.W.2d 420 (Minn. 2002)

III.  Did the district court abuse its discretion by imposing section 145.682's "mandatory dismissal with prejudice" remedy instead of extending discovery?

Minn. Stat. § 145.682
*Sorenson v. St. Paul Ramsey Med. Ctr.*, 457 N.W.2d 188 (Minn. 1990)
*Teffeteller v. Univ. of Minn.*, 645 N.W.2d 420 (Minn. 2002)

IV.  Did the district court err by omitting alleged facts in the absence of expert testimony connecting those facts to the elements of Mancini's malpractice claim?

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)
*Stroud v. Hennepin County Med. Ctr.*, 556 N.W.2d 552 (Minn. 1996)
*Silver v. Redleaf*, 194 N.W.2d 271 (Minn. 1972)

1

## STATEMENT OF THE CASE

### I.     Factual Background

#### A.     Mancini has a long history of degenerative disc disease and cervical neck pain.

Plaintiff Mario Mancini has been in state or federal custody since 2002, coming to the Federal Correctional Institution at Sandstone, Minnesota (FCI Sandstone) in 2014. App. 281–82, R. Doc. 177-5 at 22–23. He has suffered chronic neck, right shoulder, and right arm pain since the 1990s. App. 274, R. Doc. 177-5 at 15; App. 340–41, R. Doc. 177-5 at 81–82; Jt. Supp. App. ("S.App.") 105, R. Doc. 178-10 at 1.

Mancini sought treatment for his condition repeatedly over the years. *E.g.*, App. 445–79, R. Doc. 177-6 at 56–90 (BOP medical records showing treatment with ibuprofen, Motrin, gabapentin, and cortisone injections); S.App. 105, R. Doc. 178-10 at 1 (Mancini describing some of his historical treatment, including NSAIDs and "5-6 trigger point injections"); *see also* R. Doc. 178-20–178-32 (Mancini's medical records showing course of treatment with BOP from 2009 through 2012). A March 2010 MRI showed chronic degeneration in the disc spaces in Mancini's cervical spine. App. 481–82, R. Doc. 177-6 at 92.

Appellate Case: 24-1464    Page: 9    Date Filed: 07/17/2024 Entry ID: 5414272

### B. Mancini's 2017 Lifting Injury

Mancini reaggravated this longstanding injury in late June 2017. S.App. 105, R. Doc. 178-10 at 1. He reported to Health Services on June 30 that he was experiencing pain, numbness, and tingling in his right arm following a lifting event, stating these were "the exact same sx [symptoms] as in the past." S.App. 90, R. Doc. 178-3 at 1. In this initial report, the nurse practitioner noted Mancini had "no loss of function or strength." *Id.*

Mancini returned to Health Services the next day, complaining of the "same symptoms that [he] had when [he] was seen yesterday." S.App. 84, R. Doc. 178-2 at 69. A Registered Nurse provided Mancini ibuprofen and scheduled him to follow up with a physician a few days later. S. App. 85, R. Doc. 178-2 at 70. Mancini presented to Dr. Thomas Mayer[1] on July 5, 2017, complaining of pain in his arms and numbness and tingling in his fingers. S.App. 78, R. Doc. 178-2 at 63. Dr. Mayer provided Mancini a trigger point injection to relieve the pain. *Id.* Mancini also visited Physician Assistant Jenefer Southwick later that

---

[1] Dr. Mayer was a contract physician for FCI Sandstone, not a federal employee, App. 50, R. Doc. 177-2 at 40, and the primary BOP care provider for Mancini. App. 519, R. Doc. 177-7 at 37.

Appellate Case: 24-1464     Page: 10     Date Filed: 07/17/2024 Entry ID: 5414272

day, who advised he continue ibuprofen and follow up as needed. S.App. 75–76, R. Doc. 178-2 at 60–61.

Mancini returned to Dr. Mayer July 20, 2017, more than two weeks later. S.App. 70, R. Doc. 178-2 at 55. Dr. Mayer's exam revealed triceps weakness, and he ordered an expedited MRI. *Id.* Dr. Paul Harvey[2] approved the MRI that same day. App. 235, R. Doc. 177-3 at 101.

### C. Mancini's MRI showed very little change over the previous seven years.

Mancini underwent an MRI on August 7, 2017. S.App. 103, R. Doc. 178-9 at 1. The results showed multilevel spondylytic changes with moderate right neuroforaminal narrowing at C5-6 and C6-7 but "no cord compression." *Id.* at 104, R. Doc. 178-9 at 2. It is undisputed that this result represents "little change from the CT of the cervical spine performed seven years earlier on March 26, 2010." App. 839, R. Doc. 179-1 at 30.

---

[2] Dr. Harvey was the Acting Clinical Director for FCI Sandstone during 2017 and the Regional Medical Director for the BOP's North Central Region. App. 62, 71–72, R. Doc. 177-2 at 52, 61–62.

4

Three weeks later, Mancini consulted with Dr. Steven Broadway,[3] a neurosurgeon at Essentia Health in Duluth. S.App. 99, R. Doc. 178-7 at 1. By this time, Mancini reported his pain was improving. *Compare* S.App. 102, R. Doc. 178-8 (reporting "little pain" in the "2-3" range and asking for work restrictions to be removed) *with* S.App. 105, R. Doc. 178-10 (reporting pain in the "8-9-10" range two months earlier). Dr. Broadway offered to perform an anterior cervical discectomy and fusion ("ACDF") at C5-6 and C6-7 of Mancini's cervical spine. S.App. 101, R. Doc. 178-7 at 3. He warned Mancini about the known risks, including "damage to the . . . nerves/cord." *Id.* Mancini "didn't care" about any potential risks of the surgery. App. at 339–40, R. Doc. 177-5 at 80–81.

Dr. Broadway did not specify a timeframe. App. 538, R. Doc. 177-7 at 56; R. Doc. 178-6 at 3 (Dr. Broadway's original consultation report). Noting that "no timeline was recommended," PA Southwick

---

[3] Dr. Broadway is not a federal employee. R. Doc. 66 at 13 (report and recommendation to dismiss *Bivens* action against Dr. Broadway "because he was not a federal employee when he committed the acts or omissions Mancini complains of. Rather, he was a private physician"), *R. & R. adopted by* R. Doc. 68.

5

called Dr. Broadway's office on August 31 "to get [a] more direct schedule for surgery." S.App. 108, R. Doc. 178-19 at 1. Essentia then faxed an updated consultation report, this time including an addendum noting that Dr. Broadway "recommends surgery within the next 60 days," or by approximately October 30. S.App. 101, R. Doc. 178-7 at 3; App. at 746, R. Doc. 177-8 at 116. Dr. Harvey approved the ACDF surgery to be done in 90 days (or by November 30) or on the first available date. S.App. 107, R. Doc. 178-18.

### D. Mancini's initial surgery was rescheduled.

Scheduling an inmate for surgery outside the correctional institution presents unique challenges. For example, given safety concerns and the risk of an escape from custody, inmates generally cannot know when they will be leaving the institution for medical appointments. S.App. 2, R. Doc. 177-1 at 2. When an inmate is "NPO" (*nil per os*, or nothing by mouth) before a medical procedure, telling the inmate not to eat would alert him that he will be leaving the institution. *Id.* The inmate is ordinarily placed in the Special Housing Unit (SHU) without access to a telephone or email to prevent him from coordinating an escape. *Id.*

6

Mancini's surgery was first scheduled for October 18, 2017, to be performed by Dr. Broadway. App. 151, R. Doc. 177-3 at 17. The institution's Health Services Assistant sent an email to lieutenants and health staff at FCI Sandstone instructing the lieutenants to place Mancini in SHU on Tuesday, October 17, 2017. S.App 8, R. Doc. 177-1 at 8. However, the attachment to that email inadvertently stated Wednesday, October 18 instead of Tuesday, October 17, as indicated in the body of the email. S.App. 13, R. Doc. 177-1 at 13. As a result, Mancini was not placed in SHU on October 17 and was allowed to eat before his scheduled surgery. The surgery therefore had to be rescheduled.

### E.     Mancini underwent timely surgery in November 2017.

Mancini's surgery was "rescheduled as quickly as [BOP] could" accomplish it, "the soonest possible to get him in." App. at 558, R. Doc. 177-7 at 76. At a November 9 preoperative visit with PA Southwick, Mancini "reported [his] pain is gone." S.App. 30, R. Doc. 178-2 at 15. Mancini ultimately underwent surgery on November 27, 2017. S.App. 96, R. Doc. 178-5 at 1. He was discharged on November 30, 2017, three days later. S.App 92, R. Doc. 178-4 at 1.

Appellate Case: 24-1464     Page: 14     Date Filed: 07/17/2024 Entry ID: 5414272

Mancini's surgery occurred within the 90-day timeline approved by Dr. Harvey. S.App 107, R. Doc. 178-18. Dr. Broadway, who recommended and later performed Mancini's surgery, never asserted the rescheduled surgery was untimely. Because Mancini's non-emergent surgery occurred within 90 days after Dr. Broadway first recommended it, the surgery was medically timely and stood a reasonable chance of success. App. at 840, R. Doc. 179-1 at 31.

### F. Mancini experienced new and worsening symptoms after his successful surgery.

Several of Mancini's alleged permanent injuries arose or worsened only after his surgery. App. 304–06, R. Doc. 177-5 at 45–47. Mancini experienced atrophy (the measurable loss of muscle volume) for the first time two weeks after his surgery, when Dr. Mayer first noted that symptom in Mancini's right triceps on December 13, 2017. S.App. 106, R. Doc. 178-17. No medical record documents atrophy before that date, including during the preoperative exam and on the date of surgery. App. 840, R. Doc. 179-1 at 31.

8

Atrophy typically manifests two weeks after a nerve injury. App. 841, R. Doc. 179-1 at 32.[4] Because Mancini's atrophy arose for the first time two weeks after the November 27, 2017, surgery is therefore "highly likely" the cause of Mancini's atrophy two weeks later. *Id.* This adverse result is a known risk of this type of surgery. *Id.*; S.App. 101, R. Doc. 178-7 ("Risks discussed" at Mancini's neurosurgical consultation with Dr. Broadway "include . . . damage to the . . . nerves/cords[.]").

## II. Procedural History

Mancini sued the United States, the BOP, and several medical professionals under the Federal Tort Claims Act and *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971)-. R. Doc. 7 at 3. The court dismissed all but the FTCA claim alleging medical malpractice against the United States. R. Doc. 66, 68. The United

---

[4] The United States submitted the expert report of a neurologist, Dr. Steven Trobiani, M.D. App. 810–47, R. Doc. 179-1. This report remains unrebutted and undisputed.

States then moved for summary judgment based on the inadequacy of Mancini's expert opinion. R. Doc. 175.[5]

After a hearing, the Magistrate Judge issued a thoughtful report and recommendation ("R. & R."). The R. & R. carefully recited the undisputed, material facts, including specific citations to the medical records and key deposition testimony, before recommending granting the motion on two independent alternative grounds. *See generally* Appellant's Add. 1, App. 14, R. Doc. 189.

The R. & R. concluded Mancini's expert-disclosure affidavit by Dr. Gary Wyard was inadmissible under Fed. R. Evid. 702 and *Daubert*, for several reasons. First, the affidavit suffers from serious factual deficiencies, including the erroneous statement that a key MRI "showed spinal cord compression" when in fact it showed the exact opposite. *Id.* at 8, App. 21, R. Doc. 189 at 8. The expert's affidavit also incorrectly attributed to Dr. Broadway the conclusion that Mancini needed surgery "as soon as possible," even though, the court found,

_____

[5] The United States moved for summary judgment earlier, R. Doc. 155, but Mancini served a superseding expert-disclosure affidavit, R. Doc. 167, and the United States withdrew its earlier motion, R. Doc. 170.

Appellate Case: 24-1464     Page: 17     Date Filed: 07/17/2024 Entry ID: 5414272

"[n]owhere did any healthcare providers report that immediate surgery was needed to avoid permanent damage." *Id.* at 8-9, App. 21-22, R. Doc. at 8–9. The R. & R. also made clear, however, that "the Court does not find that the factual errors alone constitute a faulty foundation such that exclusion is appropriate." *Id.* at 9, App. 22, R. Doc. at 9. Rather, the R. & R. called the factual errors "part of a larger problem"—Dr. Wyard's affidavit "fails to indicate the methodology he used to reach his conclusions and leaves wholly unanswered the question of how Defendant's actions caused Plaintiffs' injuries." *Id.* Dr. Wyard's affidavit, the R. & R. reported, "fails to provide any reasoning for his conclusions as to causation." *Id.* at 10, App. 23, R. Doc. at 10. "Dr. Wyard does not describe the standard of care, explain how Defendant deviated from that standard of care, or identify why that deviation led to Mancini's injury." *Id.* Taken together, the R. & R. concluded, these failings render the opinion "too speculative and unsupported to be admissible under Rule 702 and *Daubert*." *Id.* at 9, App. 22, R. Doc. at 9.

The R. & R. identified additional failings. Dr. Wyard's affidavit fell short of the strict requirements of Minnesota's statute governing

Appellate Case: 24-1464    Page: 18    Date Filed: 07/17/2024 Entry ID: 5414272

affidavits of expert review, Minn. Stat. § 145.682. *Id.* at 11-13, App. 24-26, R. Doc. at 11-13. The grounds for this conclusion are similar to those for the R. & R.'s conclusion that the affidavit is inadmissible— the expert's affidavit "does not include any details regarding the applicable standard of care and fails to outline a chain of causation between Defendant's actions and Mancini's injury"; "does not say what actions would have satisfied" the supposed standard of care; "does not connect [Mancini's] worsened symptoms with a poor post-surgical outcome"; and generally "fails to illustrate how and why Defendant's alleged malpractice caused the injury." *Id.* at 12, App. 25, R. Doc. at 12. As a result, the R. & R. recommended the court grant Defendant's motion, exclude Mancini's expert testimony, and dismiss the case with prejudice. *Id.* at 13, App. 26, R. Doc. at 13.

Mancini objected to the R. & R., but the district court overruled the objections and adopted the R. & R. in full. Appellant's Add. 27, App. 13, R. Doc. 195 at 13. Dr. Wyard's affidavit, the court held, "does not meet the level of specificity required by Minnesota law." Appellant's Add. 20, App. 6, R. Doc. 195 at 6. "The problem," the court explained, is Dr. Wyard "never defines the standard or standards [of

12

care] he references" and fails to "offer any causal connection between the breach of the standard of care and Mr. Mancini's injuries." *Id.*, App. 6, R. Doc. 195 at 6. Rather, according to the district court, "Dr. Wyard offers only the sort of broad, 'empty conclusions' the Minnesota Supreme Court disapproved in" a variety of cases over the years. *Id.* at 21, App. 7, R. Doc. 195 at 7.

The district court went on to examine Dr. Wyard's opinions under Rule 702 and *Daubert*. *Id.* "Even if Dr. Wyard's opinions were sufficient under Minnesota statute," the district court held, the case must be dismissed because the opinion is inadmissible. *Id.* The affidavit, the district court agreed, was insufficient for several reasons, including that "Dr. Wyard does not identify the 'principles and methods'—or the application of those principles and methods—he used to evaluate Mr. Mancini's condition," and that he "does not identify the standard of care that should have been used, nor describe how or why delays in Mr. Mancini's treatment caused his present injuries." *Id.* at 24, App. 10, R. Doc. 195 at 10.

The district court also considered and rejected two objections Mancini now raises on appeal. First, the R. & R.'s statement of

13

undisputed facts did not draw "inferences in Defendant's favor," the district court held, because Mancini's "characterization of the facts in the [R. & R.] does not affect the fundamental problems with Mr. Mancini's case" and "the outcome would be the same" even "[w]ere the facts to be rewritten to include mention of the facts Mr. Mancini posits are missing." *Id.* at 25, App. 11, R. Doc. 195 at 11. And second, Mancini's proposed "alternate curing option of ordering Defendant to depose Dr. Wyard" is inappropriate because this is "not one of the 'borderline cases' where an alternative to dismissal should be employed." *Id.* at 26–27, App. 12-13, R. Doc. 195 at 12–13.

The district court therefore overruled Mancini's objections, accepted the R. & R. in full, granted the United States's motion for summary judgment, and dismissed Mancini's claim with prejudice. *Id.* at 27, App. 13, R. Doc. 195 at 13.

Mancini appeals, reasserting his twice-rejected arguments.

# SUMMARY OF THE ARGUMENT

The Court should affirm summary judgment for the United States for two independently dispositive reasons. First, the opinions contained in Mancini's expert-disclosure affidavit are inadmissible under Federal Rule of Evidence 702 and *Daubert*. And second, Mancini's broad and conclusory expert-disclosure affidavit fails to show his malpractice claim has any merit as required by state law.

Mancini's medical malpractice claim requires he submit expert testimony on the standard of care, its breach, and causation. *Walton v. Jones*, 286 N.W.2d 710, 714 (Minn. 1979). To overcome summary judgment, Mancini offered the affidavit of Dr. Gary Wyard. But Dr. Wyard's conclusions, the district court correctly held, were "too speculative and unsupported to be admissible under Rule 702 and *Daubert*." *Id.* at 25 (quoting R. & R., *id.* at 9). The district court was well within its broad discretion to exclude Dr. Wyard's opinions from trial, without which, Mancini's medical malpractice claim fails as a matter of law.

Mancini's expert-disclosure affidavit fails to meet the most basic requirements of Minnesota law. To reduce meritless malpractice

15

litigation, Minnesota law requires malpractice plaintiffs to disclose an expert opinion describing "the substance of the facts and opinions to which the expert is expected to testify, and a summary of the grounds for each opinion." Minn. Stat. § 145.682, subd. 4(a). The state's high court has long required these expert affidavits to state more than "empty conclusions which . . . can mask a frivolous claim." *Sorenson v. St. Paul Ramsey Med. Ctr.*, 457 N.W.2d 188, 193 (Minn. 1990). Instead, the affidavit must (1) "disclose specific details" about the standard of care, (2) point to a breach of that standard, and (3) outline the causal chain between the breach and the plaintiff's damages. *Teffeteller v. Univ. of Minn.*, 645 N.W.2d 420, 428 (Minn. 2002). The district court correctly held that Mancini's expert witness, Dr. Gary Wyard, failed this test. And it correctly dismissed Mancini's malpractice claim, as the statute requires, instead of constructing an extratextual safe harbor.

16

**ARGUMENT**

**I.    The district court did not abuse its discretion by excluding Dr. Wyard's opinions under Rule 702.**

**A.    Standard of Review**

The Court should begin and end its analysis by affirming the district court's decision to exclude Dr. Wyard's testimony from evidence. The Court reviews that decision for an abuse of discretion, even at the summary-judgment stage, and should reverse only if the district court's "ruling is manifestly erroneous." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142–43 (1997) (quoting *Spring Co. v. Edgar*, 99 U.S. 645, 658 (1879)). "Deference," the United States Supreme Court says, "is the hallmark of abuse-of-discretion review." *Id.*

**B.    The district court properly exercised its discretion by excluding Dr. Wyard's opinions under Rule 702 and *Daubert*.**

The district court correctly excluded Dr. Wyard's proposed testimony, requiring summary judgment for the government. The newly amended Federal Rule of Evidence 702 requires the proponent of expert testimony to show "it is more likely than not that":

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

17

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702 (amended effected Dec. 1, 2023). Dr. Wyard's proposed testimony satisfied none of these factors.

Mancini misstates the law in his effort to assign error. He contends, "It was for the factfinder to decide whether Dr. Wyard's opinions are sound." Appellant's Br. at 20. But it is the district court, not the factfinder, that acts as gatekeeper to ensure Rule 702's foundational requirements are satisfied. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999); *see also* Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified . . . or evidence is admissible."). Rule 702 makes clear what this Court has long held: "The proponent of expert testimony must prove its admissibility by a preponderance of the evidence." *Lauzon v. Senco*, 270 F.3d 681, 686 (8th Cir. 2001). The district court properly acted as gatekeeper and did not abuse its discretion by finding Dr. Wyard's opinions are unsound.

18

### 1. Mancini did not show that Dr. Wyard is qualified to opine about other professionals in other medical specialties.

Mancini failed to show Dr. Wyard—an orthopedic surgeon—is qualified to opine about professions other than his own. Appellant's Add. 23–24, App. 9-10, R. Doc. 195 at 9–10. Dr. Wyard is a board-certified Orthopedic Surgeon, but his "curriculum vitae is not attached to his affidavit" or "the parties' other submitted exhibits." *Id.*; App. 257, R. Doc. 177-4, ¶ 2. Mancini therefore did not show how Dr. Wyard's "scientific, technical, or other specialized knowledge" qualifies him to supply the standard of care applicable to lower-level providers in a primary care setting.

Dr. Wyard's "academic training, licensure, and scope of practice" do not qualify him to opine about professionals with different trainings, licensures, and scopes of practice. *See Shipp v. Murphy*, 9 F.4th 694, 701 (8th Cir. 2021) (nurse practitioner not qualified to establish physician's standard of care); *Wall v. Fairview Hosp. and Healthcare Servs.*, 584 N.W.2d 395, 405 (Minn. 1998) ("[W]e hold as a matter of law that [a psychologist and psychotherapist] are not competent to testify about the appropriate standard of care for a

19

psychiatric nurse."). Mancini's case depends on Dr. Wyard's opinions applying to the federal employees whose care is at issue: nurses, a PA, and a primary-care doctor. With no evidence showing this orthopedic surgeon's qualifications to opine about the standards of care applicable to other professionals in a primary care setting, the district court could not assess whether Dr. Wyard is qualified.

Nonetheless, the court "assum[ed]" without deciding that Dr. Wyard is qualified and proceeded to analyze the more egregious failures in his affidavit. Appellant's Add. at 24, App. 10, R. Doc. 195 at 10. Mancini mischaracterizes the district court's assumption as an affirmative finding that Dr. Wyard is qualified. Appellant's Br. at 17–18. But the district court's decision speaks for itself—Mancini failed to show Dr. Wyard's qualifications to opine about the standards of care in other specialties and professions, Appellant's Add. at 23, App. 9, R. Doc. 195 at 9, and the district court did not abuse its discretion by excluding his testimony.

### 2. Dr. Wyard made critical factual errors that undermine the factual basis for his opinions.

Worse, Dr. Wyard's brief affidavit is shot through with "factual errors and contradictions to record evidence that give the Court cause

Appellate Case: 24-1464    Page: 27    Date Filed: 07/17/2024 Entry ID: 5414272

for concern." Appellant's Add. 24, App. 10, R. Doc. 195 at 10. An expert's opinions are inadmissible if they are "unsupported by sufficient facts, or contrary to the facts of the case." *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757 (8th Cir. 2006). The district court's finding that Dr. Wyard's "factual errors and contradictions to record evidence" undermined the reliability of his opinions was not manifestly erroneous. The Court should not disturb the district court's exercise of its discretion.

Dr. Wyard's opinions are based on a misreading of Mancini's MRI findings. He concludes, without any citation to evidence, that "Plaintiff's MRI showed . . . spinal cord compression." App. 258, R. Doc. 177-4 at 2, ¶ 9. But the records of that MRI expressly contradict that conclusion, finding "*No* cord compression or abnormal cord signal." S.App. 104, R. Doc. 178-9 at 2. With no explanation for how this counterfactual reading of the record informed Dr. Wyard's conclusions, Mancini cannot meet his burden of showing Dr. Wyard's opinions are based on sufficient facts.

Dr. Wyard also twice misstates Mancini's surgery date. It is undisputed that Mancini's surgery occurred on November 27, 2017,

21

and that he was discharged three days later. S.App. 92–93, R. Doc. 178-4 at 1–2 (noting "Discharge Date: 11/30/2017" and "Date of Surgery: 11/27/17"). But Dr. Wyard reports—not once but twice—that the surgery occurred on November 30, 2018. App. 258–59, R. Doc. 177-4 at 3, ¶¶ 13–14. This both misstates the year of the surgery and confuses Mancini's surgery date with his discharge date—a detail a careful orthopedic surgeon should understand. These factual errors, the district court held, were enough to "give the Court cause for concern." Appellant's Add. at 24, App. 10, R. Doc. 195 at 10.

Mancini ignores the district court's concerns and this Court's standard of review. He does not address Dr. Wyard's fundamental misreading of the MRI result and misdiagnosis of Mancini's condition. He then seeks to minimize Dr. Wyard's mistakes as "simple misstatements of dates" that "are hardly worthy of the extreme sanction of exclusion." Appellant's Br. at 19. But it is the district court's role to determine what factual errors justify excluding an expert's testimony, and Mancini fails to explain how the district court's determination amounts to an abuse of discretion. In a case involving an alleged delay of care, failing to reliably account for the

Appellate Case: 24-1464     Page: 29     Date Filed: 07/17/2024 Entry ID: 5414272

relevant dates shows more than just Dr. Wyard's carelessness with facts; it is a critical error undermining the entire opinion. Exclusion was well within the court's discretion.

### 3. Dr. Wyard does not identify or apply any reliable principle or method to reach his conclusions.

Worse yet, Dr. Wyard does "not identify the 'principles and methods'—or the application of those principles and methods—he used to evaluate Mr. Mancini's condition." Appellant's Add. 24, App. 10, R. Doc. 195 at 10. Rule 702 requires that an expert's opinions must be "the product of reliable principles and methods," and the expert must "reliably appl[y] the principles and methods to the facts of the case." Fed. R. 702(c), (d). This requires a "flexible and fact specific" approach, including "whether the theory or technique is subject to testing, whether it has been tested, whether it has been subjected to peer review and publication, whether there is a high known or potential rate of error associated with it, and whether it is generally accepted within the relevant community." *Unrein v. Timesavers, Inc.*, 394 F.3d 1008, 1011 (8th Cir. 2005). The district court must exclude expert testimony that "is connected to the existing data only by the

23

*ipse dixit* of the expert." *Marmo*, 457 F.3d at 758 (quoting *Gen. Elec. Co.,* 522 U.S. at 146).

Dr. Wyard's unadorned conclusions are classic *ipse dixit*. Dr. Wyard, the district court held, "does not identify the standard of care that should have been used, nor describe how or why delays in Mr. Mancini's treatment caused his present injuries." Appellant's Add. 24, App. 10, R. Doc. 195 at 10. He cites no diagnostic criteria or clinical guidance showing a person presenting with Mancini's condition requires emergency surgery. He points to no medical studies and conducts no differential diagnosis to show a delay caused Mancini's permanent condition.[6] He fails to "exclude confounding factors," like the known risk of nerve injury during Mancini's surgery, "leav[ing] open the possibility of competing causes[.]" *Marmo*, 457 F.3d at 758 (quoting *Reference Manual on Scientific Evidence*, at 428–29). The

---

[6] A reliable differential diagnosis requires ruling in the purported cause and ruling out others. But the expert must show his work to ensure reliability. *See, e.g.*, *Bland v. Verizon Wireless, (VAW) L.L.C.*, 538 F.3d 893, 897 (8th Cir. 2008) (affirming exclusion of unreliable differential diagnosis); *Glastetter v. Novartis Pharms. Corp.*, 252 F.3d 986, 989 (8th Cir. 2001) (same); *Turner v. Iowa Fire Equip. Co.*, 229 F.3d 1202, 1208 (8th Cir. 2000) (same).

district court did not abuse its discretion by finding Dr. Wyard's bare conclusions inadmissible.

Mancini asks the Court to take Dr. Wyard's word for it. Because Dr. Wyard claims to have reviewed "the medical records available to Plaintiff" and to have relied on his education, training, and experience, Mancini contends the resulting opinions are reliable. Appellant's Br. at 18. But if Dr. Wyard wanted the district court to credit his supposed experience and review of the medical records, he needed to "explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702, advisory committee's notes (2000 amendments). "The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" *Id.*

## II. Mancini's expert affidavit failed to comply with Minnesota substantive law.

### A. Standard of Review

Mancini next challenges the district court's interpretation and application of Minnesota's certificate-of-merit statute, Minn. Stat. § 145.682. Appellant's Br. at 9–16. The Court reviews that decision *de*

*novo. Stowell v. Huddleston*, 643 F.3d 631, 633 (8th Cir. 2011). He also asserts a related challenge to the district court's refusal to extend the statute's deadline and require further discovery. Appellant's Br. at 24–25. This challenge, by contrast, is subject to the abuse-of-discretion standard. *Flores v. United States*, 689 F.3d 894, 900 (8th Cir. 2012).

### B. Dr. Wyard's broad and conclusory affidavit fails to meet the requirements of section 145.682.

Plaintiffs bringing medical malpractice cases under Minnesota law must show their claims have merit early in litigation. Minn. Stat. § 145.682. To weed out frivolous malpractice claims, the law requires plaintiffs to disclose an expert affidavit describing "the substance of the facts and opinions to which the expert is expected to testify, and a summary of the grounds for each opinion." *Id.,* subd. 4(a). The remedy for failing to comply is dismissal with prejudice. *Id.*, subd. 6(c).

Minnesota's courts interpret this statute to require more than "empty conclusions[,] which . . . can mask a frivolous claim." *Sorenson v. St. Paul Ramsey Med. Ctr.*, 457 N.W.2d 188, 193 (Minn. 1990). Instead, the affidavit must (1) "disclose specific details" about the standard of care, (2) point to a breach of that standard, and (3) outline the causal chain between the breach and the plaintiff's damages.

26

*Teffeteller v. Univ. of Minn.*, 645 N.W.2d 420, 428 (Minn. 2002). Minnesota courts demand "strict compliance with the requirements of Minn. Stat. § 145.682." *Broehm v. Mayo Clinic Rochester*, 690 N.W.2d 721, 726 (Minn. 2005). "We have been firm in holding that failure by the plaintiff to strictly satisfy the requirements under Minn. Stat. § 145.682, subd. 4(a) results in dismissal of the claim with prejudice." *Id.* The district court correctly held that the expert disclosure affidavit did not satisfy the statute.

### 1. Dr. Wyard's affidavit fails to specifically describe the standard of care.

Start with Dr. Wyard's standard-of-care opinion. Dr. Wyard references the "applicable standard of care," "the appropriate amount of time," "the proper standard of care," and "the preoperative standard of care." App. 257–58, R. Doc. 177-4 at 1–2, ¶¶ 4, 5, 8, 12. He also charges "Defendant" with "failing to treat Plaintiff in the appropriate amount of time," "deviat[ing] from the proper standard of care," and engaging in "undue delay." *Id.*, ¶¶ 5, 8, 12. But Dr. Wyard never "*defines* the standard or standards he references." Appellant's Add. 20, App. 6, R. Doc. 195 at 6 (emphasis added). Observing that a patient should receive "proper" care within "the appropriate amount of time"

27

and "without undue delay" does not constitute a standard of care—it is an empty conclusion.

Dr. Wyard's "empty conclusions" cannot satisfy the statute's requirements. *See Sorenson*, 457 N.W.2d at 193. A medical standard of care is comprised of the acts or omissions a reasonably skilled provider in her particular field would have taken under circumstances like those confronted by the defendant. *Stowell*, 643 F.3d at 634; *Mattke v. Deschamps*, 374 F.3d 667, 671 (8th Cir. 2004). Dr. Wyard's affidavit fails to disclose these most basic requirements.

Dr. Wyard does not say *what* the applicable standard of care required. An expert who testifies he "is familiar with the applicable standard of care but fails to state what it was or how the [medical provider] departed from it" fails to support a *prima facie* malpractice case. *Lindberg v. Health Partners, Inc.*, 599 N.W.2d 572, 576–78 (Minn. 1999). Observing that injury "should be avoided" isn't enough either. *Anderson v. Rengachary*, 608 N.W.2d 843, 848 (Minn. 2000); *Sorenson*, 457 N.W.2d at 192–93 ("To state, as was done in this case, that the defendants 'failed to properly evaluate' and 'failed to properly diagnose' is not enough."). Instead of simply pointing to an undesirable

28

outcome, the expert must "state what *particular measures* a physician should take to avoid" the injury and "describe the defendant's acts or omissions that allegedly violated the standard of care and caused the injury." *Anderson*, 608 N.W.2d at 848 (emphasis added).

Dr. Wyard's affidavit, the district court held, is limited to referencing "the appropriate amount of time," accusing unnamed providers of "undue delay," and alleging "deviations" from the standard of care. Appellant's Add. at 20, App. 6, R. Doc. 195 at 6 (quoting App. 257–59, R. Doc. 177-4, ¶¶ 5, 8, 12, 15). But none of these empty conclusions identifies any act or omission a reasonably skilled nurse, PA, or primary care doctor would have taken under similar circumstances. Merely attaching the "standard of care" label fails to "disclose the *substance* of" Dr. Wyard's opinion on what a reasonable surgical timeline would have been. *See* Minn. Stat. § 145.682, subd. 4(a) (emphasis added).

Dr. Wyard also fails to show *how* a reasonable provider under the circumstances would have known Mancini required earlier treatment. Minnesota law requires more than merely showing a provider's treatment was unsuccessful. *See Klisch v. Meritcare Med.*

29

*Grp., Inc.*, 134 F.3d 1356, 1359 (8th Cir. 1998) ("Foresight, not hindsight, is the standard of negligence."). The plaintiff must instead show the provider failed to give reasonable care under the circumstances known or reasonably available to them at the time. *Id.* at 1360 (citing *Oulelette v. Subak*, 391 N.W.2d 810, 816 (Minn. 1986)). If the facts available would not have alerted a reasonable provider that Mancini's chronic symptoms suddenly required emergency surgery, then the standard of care does not require an emergency surgery.

Dr. Wyard does not show how the available facts, without the benefit of hindsight, would have alerted a reasonable provider that emergency surgery was necessary. It is undisputed that Mancini presented with "the exact same sx [symptoms] as in the past." S.App. 90, R. Doc. 178-3 at 1. As PA Southwick explained in her deposition, "When people have pain for longstanding periods of time, it becomes more difficult to clarify whether the pain they're reporting now is different than what they've been reporting on previous evaluations. So everybody's determination of that can vary on the emergency of it." App. 568, R. Doc. 177-7 at 86. It is also undisputed that the conservative treatment provided to Mancini resulted in his reporting

decreased pain symptoms in the months that followed. *Compare* S.App. 30 (reporting "pain is gone" in November), 35 (reporting "no pain" in October), 102 (reporting pain in the "2-3" range in August) *with id.* at 105 (reporting pain in the "8-9-10" range in June). By stating the standard of care in only broad, conclusory terms, Dr. Wyard offers only his post-hoc judgment without any insight into how a reasonable provider under these circumstances would have handled this case differently.

Dr. Wyard did not identify *to whom* his supposed standard of care applies. The medical standard of care in Minnesota is specific to a "particular field of inquiry." *Mattke*, 374 F.3d at 671 (quoting *Swanson v. Chatterton*, 160 N.W.2d 662, 669 (Minn. 1968)); *see also Stowell*, 643 F.3d at 635 (holding ophthalmologist not qualified to opine on the standard of care applicable to orthopedic surgeon). And yet, despite the variety of professionals whose conduct is at issue in this case, Dr. Wyard offers no hint of who is bound by his supposed

31

standard of care, attributing its breach instead to "Defendant."[7]  App. 257, R. Doc. 177-4 at 1, ¶ 5.

These are the most basic characteristics of a standard of care, left entirely undisclosed in Dr. Wyard's affidavit. The closest Dr. Wyard comes to establishing a standard of care and its breach is charging the United States with failing to ensure Mancini did not eat before surgery, citing the institution's policy. App. 258, R. Doc. 177-4 at 2, ¶¶ 11, 12. But this omission does not amount to a breach of the standard of care unless Mancini's rescheduled surgery occurred beyond what a reasonably skilled provider would have offered under the circumstances.

Because Dr. Wyard did not say what a reasonable surgical timeline would have been, Mancini cannot show that a reasonably skilled professional would have ensured his surgery occurred sooner.

_____

[7] The only specific individuals mentioned in Dr. Wyard's affidavit are Dr. Thomas Mayer, a primary care physician, and Dr. Stephen Broadway, a neurosurgeon. App. 258–59, R. Doc. 177-4 at 2–3, ¶¶ 7, 10, 13. Both were contractors, not employees. App. 50, R. Doc. 177-2 at 40; R. Doc. 66 at 13. Acts or omissions by independent contractors are not attributable to the United States in this FTCA action. 28 U.S.C. §§ 1346(b)(1), 2671; *Knudsen v. United States*, 254 F.3d 747, 750 (8th Cir. 2001).

Appellate Case: 24-1464     Page: 39     Date Filed: 07/17/2024 Entry ID: 5414272

The district court correctly held that the expert's empty conclusions failed to adequately disclose the applicable standard of care. The Court should affirm that decision.

### 2. The affidavit does not outline the supposed chain of causation.

The emptiness of Dr. Wyard's standard-of-care conclusion is matched only by his conclusory treatment of causation. An expert-disclosure affidavit must offer more than "broad, conclusory statements as to causation." *Stroud v. Hennepin County Med. Ctr.*, 556 N.W.2d 552, 556 (Minn. 1996). The expert must "include an outline of the chain of causation between the violation of the standard of care and the plaintiff's damages" and "illustrate 'how' and 'why' the alleged malpractice caused the injury." *Teffeteller*, 645 N.W.2d at 428, 429 n.4.

Dr. Wyard does not "offer any causal connection between the breach of the standard of care and Mr. Mancini's injuries." Appellant's Add. 20, App. 6, R. Doc. 195 at 6. Delay in care alone is not enough to show causation under Minnesota law. *Leubner v. Sterner*, 493 N.W.2d 119, 122 (Minn. 1992) ("[I]f a delay in [care] is enough in itself, expert testimony on causation would not be necessary."). That is all Dr. Wyard offers. His causation opinion is composed of just two sentences:

"This string of delays resulted in Plaintiff's symptoms worsening significantly" between his first complaint and his surgery, and "[a]s a result of Defendant's deviations from the standard of care for an ACDF, Plaintiff has suffered permanent" injuries. App. 259, R. Doc. 177-4 at 3, ¶¶ 14–15. This unexplained leap from an alleged delay to damages is insufficient to show causation.

Compare the two sentences in Dr. Wyard's affidavit to the expert opinions in *Stroud*, *Lindberg*, *Anderson* and *Teffeteller*, each of which the state supreme court found deficient:

- *Stroud*, 556 N.W.2d at 554: "I . . . will testify that as a result of the breach of the standard of care . . . there was a failure to diagnose and treat a subarachnoid hemorrhage which ultimately resulted in a complicated hospital course and death of the Plaintiff."

- *Lindberg*, 599 N.W.2d at 575: "4. Based upon a reasonable degree of medical certainty, it is more probable than not, that if, among other things, Debra Lindberg had been instructed to seek medical treatment at the time of her phone call on the morning of March 28, 1994, Lukas Stewart Lindberg would not have died.

34

5. Based upon a reasonable degree of medical certainty, Lukas Stewart Lindberg died as a result of the negligent and careless conduct of the Defendants and/or their agents and employees, including midwife Sharon Nichols and Donne Mathiowitz."

- *Anderson*, 608 N.W.2d at 848: "[T]here was a deviation from the standard of care provided to this patient which caused the patient to have postoperative dysphasia [sic] of undetermined etiology."

- *Teffeteller*, 645 N.W.2d at 425: "[I]t is Dr. Perloff's opinion that had Thad Roddy's clinical status [been] appreciated as Morphine toxicity at about 8:30 a.m., and had appropriate treatment measures been utilized, i.e. frequent boluses or a continuous infusion of naloxone continuously monitored by a physician, Thad Roddy, to a reasonable degree of medical probability would have been revived successfully. Finally, it is Dr. Perloff's opinion that the departures from accepted levels of care, as above identified, were a direct cause of Thad Roddy's death."

35

The Minnesota Supreme Court, in each of these cases, found the expert opinion failed to adequately show causation. Each of these statements was at least as detailed as Dr. Wyard's.

### 3. The Minnesota Supreme Court's decision in *Rygwall* does not change the analysis.

The supreme court's latest entry reaffirms this long line of cases. In *Rygwall, as Trustee for Rygwall v. ACR Homes, Inc.*, the Minnesota Supreme Court confronted an alleged delay in treatment and discussed an acceptable causation opinion. *See generally* 6 N.W.3d 416 (Minn. 2024). The court discussed the long line of cases from *Sorenson* to *Teffeteller* and reaffirmed those decisions. *Id.* at 431–435. "To show causation in circumstances where expert testimony is necessary," the court explained, "the expert affidavit must include an opinion with proper foundation and enough information about the specific case to reassure the court that the jury will have sufficient information to draw a reasonable inference—without speculating—that the provider's conduct caused the plaintiff's injury." *Id.* at 435. Dr. Wyard's opinion fails this test.

Contrast Dr. Wyard's causation opinion with the expert opinion at issue in *Rygwall*. In a ten-page affidavit, the expert there

36

established a material dispute on causation by relying on "medical studies showing that, for each hour of delay in administering antibiotics, the risk of morbidity and mortality for someone in [the plaintiff's] position increases." *Id.* at 435–36. By relying on medical studies, the expert could testify "how" and "why" earlier treatment would interrupt the progression of the plaintiff's injuries without inviting the jury to speculate. *Id.*

Dr. Wyard, by contrast, does not disclose "the mechanism by which" the alleged delay caused Mancini's injuries. Specifically, Dr. Wyard does not show how or why he concluded that Mancini's permanent injuries occurred during the alleged delay, instead of before or after. Unlike the expert in *Rygwall*, Dr. Wyard does not cite any medical literature causally connecting Mancini's surgical timeline with an increased risk of permanent injury. Nor does he point to any evidence from the medical records showing worsening nerve compression during the supposed delay in surgery, rather than before or after. Despite claiming to have reviewed all the medical records, Dr. Wyard does not discuss Mancini's 2010, 2017, and 2019 imaging

results to show his condition rapidly changed or required earlier surgical intervention.[8]

Medical malpractice is not strict liability. Without explaining how or why the alleged breach caused Mancini's damages, Dr. Wyard's opinions cannot meet the standard required by Minnesota law. The Court should affirm the district court's summary-judgment order.

## C. The district court did not abuse its discretion by imposing the statute's "mandatory dismissal with prejudice" remedy.

Ignoring the standard of review, Mancini asserts the district court erred by declining to extend discovery. Appellant's Br. at 24–25. This assignment of error is subject to the deferential abuse-of-discretion standard. *See Flores*, 689 F.3d at 900 ("We conclude . . . that the magistrate judge did not abuse her discretion in denying plaintiffs' motion to extend deadlines to serve expert affidavits [under section 145.682].")). The district court did not abuse its discretion by declining to reopen discovery and forestall the inevitable dismissal of Mancini's meritless malpractice case.

---

[8] In fact, it is undisputed that Mancini's chronic condition had changed "very little" between March 2010 and August 2017. App. at 839, R. Doc. 179-1 at 30.

Mancini's insistence on a "less drastic" remedy proceeds from a mistaken premise—that this is a "borderline case." Appellant's Br. at 24–25 (quoting *Sorenson*, 457 N.W.2d at 193). As the district court held, "Dr. Wyard's affidavit fails to identify the applicable standard of care, and fails to causally connect Defendant's alleged breach of the standard to Mr. Mancini's injuries." Appellant's Add. at 26–27, App. 12-13, R. Doc. 195 at 12–13. These are not mere technical deficiencies[9]—they are "essential elements that must be included in the affidavit to avoid dismissal." *Teffeteller*, 645 N.W.2d at 428. The district court was well within its discretion to dismiss rather than prolong this case.

## III. The district court correctly limited its analysis to the material facts.

### A. Standard of Review

Mancini also challenges the district court's recitation of the facts. Appellant's Br. at 20–23. "Only disputes over facts that might affect

---

[9] Mancini's counsel understandably refused to sign Dr. Wyard's grossly deficient affidavit, even though counsel's signature is required by section 145.682, subdivision 4(a). If that truly technical defect were the only problem with Dr. Wyard's affidavit, perhaps a different remedy would be appropriate. But the United States challenged the substantive deficiencies in Dr. Wyard's opinion.

39

the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Whether the undisputed, material facts support summary judgment is reviewed *de novo. Stowell*, 643 F.3d at 633.

**B.     Mancini's nonexpert speculation does not create a material factual dispute.**

Mancini cannot identify any *material* facts or inferences the district court should have drawn in his favor. The supposed facts and inferences he does identify would not change "the fundamental problems with Mr. Mancini's case." Appellant's Add. 26, App. 12, R. Doc. 195 at 12. Because he has not shown expert testimony interpreting and applying the facts he claims were omitted, those facts are immaterial.

Isolated facts and inferences from medical records, unmoored from expert testimony, permit only speculation. Expert testimony is necessary to interpret medical facts and explain to the factfinder how they support each element of a malpractice claim. *Sorenson*, 457 N.W.2d at 192. The expert must "set out how the expert will use the

40

facts in the hospital record to arrive at opinions of malpractice and causation." *Stroud*, 556 N.W.2d at 555. Anything less leaves the factfinder to speculate. *Silver v. Redleaf*, 194 N.W.2d 271, 273 (Minn. 1972) (holding expert testimony is necessary to prevent factfinder from speculating about medical causation).

Mancini has not argued this is one of the "exceptional cases" in which expert testimony is unnecessary. *Sorenson*, 457 N.W.2d at 191. Without expert testimony explaining "how the expert will use the facts in the hospital record to arrive at opinions of malpractice and causation," the supposedly omitted facts do nothing but invite the factfinder to speculate about how those facts might establish the standard of care, its breach, or causation. *Stroud*, 556 N.W.2d at 555; *Silver*, 194 N.W.2d at 273. Those facts are therefore immaterial, and the district court was right to disregard them.

## <u>CONCLUSION</u>

For all the foregoing reasons, the district court's judgment should be affirmed.

41

Dated:  July 15, 2024                    ANDREW M. LUGER
                                         United States Attorney

                                         /s/ David W. Fuller
                                         By:  David W. Fuller
                                         Assistant U.S. Attorney
                                         Attorney ID No. 390922
                                         600 United States Courthouse
                                         300 South Fourth Street
                                         Minneapolis, MN 55415
                                         (612) 664-5600


                                         Attorneys for Appellee

## CERTIFICATE OF COMPLIANCE

The undersigned attorney for the United States certifies this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32. The brief has 7,646 words, proportionally spaced using Century Schoolbook, 14-point font. The brief was prepared using Microsoft Word 365. The undersigned attorney also certifies that the brief has been scanned for viruses and, to the best of our ability and technology, believes it is virus-free.


Dated: July 15, 2024                    ANDREW M. LUGER
                                        United States Attorney


                                        /s/ David W. Fuller
                                        By: David W. Fuller
                                        Assistant U.S. Attorney

                                        Attorneys for Appellee


43